

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00173-CR

_____

CHRISTOPHER MARK WALL, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CR17-0896

---

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

## I. Introduction

In November 2017, Appellant Christopher Mark Wall killed two women—

Ashley Pohorence and Krista McClellan—by shooting them during the same criminal

transaction after they made him a victim of their "sextortion" scheme.[1] He pleaded

not guilty—relying on self-defense and defense of another (his then-fourteen-year-old

daughter K.W.[2]) as justifications—but a jury found him guilty and convicted him of

capital murder,[3] and the trial court sentenced him to confinement for life without

parole. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A) (stating that a person commits

capital murder if he murders more than one person during the same criminal

transaction); *see also id.* § 12.31(a)(2) (stating that an individual adjudged guilty of a

capital felony in a case in which the State does not seek the death penalty shall be

punished by imprisonment for life without parole if he committed the offense when

he was at least 18 years old). In five issues, Wall challenges the sufficiency of the

---

[1]"Sextortion," also known as "trick-rolling," occurs when a perpetrator poses as a prostitute to extort money "out of [the trick] by telling [him] the horrible things that are going to happen if [he doesn't] pay up in the form of telling [his] spouse[ or] telling [his] employer" about his attempt to hire a prostitute.

[2]Because K.W. was a minor at the time of the offense, we refer to her by her initials. *See* Tex. R. App. P. 9.10(a)(3).

[3]The three-count indictment alleged capital murder in the first count as to the shootings of Pohorence and McClellan in the same criminal transaction. The second count alleged Pohorence's murder, and the third count alleged McClellan's murder.

evidence to support his conviction and punishment, embedding two unpreserved defensive jury-charge issues—mistake-of-fact and sudden passion—within his evidentiary challenges.[4] Because the evidence is sufficient to support Wall's conviction, and because he did not preserve his mistake-of-fact complaint and was not entitled to a sudden-passion instruction, we affirm the trial court's judgment.

## II. Sufficiency

We combine our evidentiary review with our analysis to avoid repetition.

## A. Standard of review and applicable law

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder

---

[4]In his first and second issues, Wall contends that the evidence is insufficient because he had a reasonable but mistaken belief about matters of fact that negated his culpability. In his third and fourth issues, he asserts that the State failed to prove beyond a reasonable doubt that he did not act in self-defense or in defense of K.W. And in his fifth issue, he claims that the evidence is insufficient to support capital murder because he acted with sudden passion, which he asserts should have reduced the jury's finding to that of second-degree murder.

3

alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

To convict Wall of capital murder, the jury had to determine beyond a reasonable doubt that—in the same criminal transaction—he had intentionally or knowingly caused the deaths of Pohorence and McClellan by shooting them with a firearm. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A). The jury also had to determine that his actions were not in self-defense or in the defense of others. *See Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991) (stating that self-defense is a fact issue for the jury).

Under the Penal Code, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). An actor's belief is presumed to be reasonable if the actor knew or had reason to believe that the person against whom the force was used: (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment; (B) unlawfully and with force removed, or was attempting to remove

4

unlawfully and with force, the actor from his habitation, vehicle, or place of business or employment; or (C) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Id.* § 9.31(a)(1)(A)–(C). Otherwise, the Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

To justify the use of deadly force, the actor not only must be justified in using force against the other under Section 9.31 but also must reasonably believe that deadly force is immediately necessary to protect the actor from another's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Id.* § 9.32(a); *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). Like with the use of nondeadly force, the actor's belief of immediate necessity is presumed to be reasonable if the actor knew or had reason to believe that the person against whom the deadly force was used had done one of the actions listed above, did not provoke the person against whom the force was used, and was not otherwise engaged in criminal activity other than a Class C traffic offense. Tex. Penal Code Ann. § 9.32(b).

A person is justified in using force or deadly force against another to protect a third person if (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly

5

force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person that he seeks to protect; and he reasonably believes that his intervention is immediately necessary to protect the third person. *Id.* § 9.33.

In the self-defense and defense-of-others context, force that is "immediately necessary" is force that is needed at that moment—"when a split second decision is required"—to avoid harm that is near at hand. *Henley v. State*, 493 S.W.3d 77, 89–90 (Tex. Crim. App. 2016). A defendant's sincere belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law if the undisputed facts demonstrate a complete absence of "immediate necessity" or "imminent harm" as legally defined. *Harper v. State*, 508 S.W.3d 461, 467 (Tex. App.—Fort Worth 2015, pet. ref'd).

After a defendant has introduced some evidence of self-defense or defense of others, the State bears the burden of persuasion to disprove it. *See Braughton*, 569 S.W.3d at 608; *Zuliani v. State*, 97 S.W.3d 589, 594 & n.5 (Tex. Crim. App. 2003). The State's burden does not require it to introduce evidence disproving the defenses; rather, it requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. To determine evidentiary sufficiency to disprove a self-defense or defense-of-others theory, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have

found against the appellant on one of the defensive issues beyond a reasonable doubt. *Id.* at 609; *see Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

## B. State's case

The State's evidence established that on the evening of November 4, 2017, Wall (age 33, 190 pounds, and approximately 5'10") shot and killed Pohorence (age 23, 136 pounds, 5'6") and McClellan (age 21, 125 pounds, 5'3"). The shootings occurred at the First Financial Bank in Willow Park, just off of I-20, in the portion of the bank's parking lot without video surveillance.[5] On his way out of the bank's parking lot, Wall ran over McClellan's body with his car, leaving behind bloody tire tracks. Because Wall admitted to the shootings, we will focus on the evidence pertinent to his self-defense and defense-of-others claims. There were two witnesses to the shootings—Wall and Sierra McMahan.

### 1. The sextortion scheme

McClellan, Pohorence, and McMahan (age 23, 120 pounds, 5'2") had been involved in a sextortion scheme. McMahan had grown up in Borger, a small town near Amarillo, with an abusive alcoholic stepfather, and she left home and school at

---

[5]The portions of the parking lot that had video surveillance showed that Wall's car—a red sedan with a stick-figure bumper sticker of a family of three with a father in a superhero cape—had arrived at the bank at 6:07 p.m. Wall drove around the bank's surrounding parking lots between 6:08 p.m. and 6:30 p.m. The bank's surveillance video showed that Wall had been wearing a white shirt, which—along with his shoes—was seized at his home. The shirt's blood stains contained Pohorence's DNA; a blood stain on his shoe contained McClellan's DNA.

age 14.[6] Pohorence recruited McMahan through Facebook and lured her to the Dallas–Fort Worth area with photos of vacations, money, and "all types of cool stuff."[7] McMahan had assumed that Pohorence was a stripper, and when Pohorence invited her to come live with her and make some money, McMahan agreed, thinking that she was also going to be a stripper.

McMahan moved in with McClellan, Pohorence, and an older black man named Byron "Payday" Johnson, who owned both vehicles found at the crime scene—a white Honda and a white Mercedes. Rent and food were included, as were spa days every two weeks to maintain the women's appearances. McMahan moved into the house in July 2017 and worked thousands of calls—twenty to fifty per day—while she lived there. In addition to Payday, Pohorence, and McClellan, "randoms" came and went.

Pohorence placed erotic-massage advertisements on Backpage, a prostitution website that no longer exists, and then at least two of the women would go on "calls" as solicited by Backpage clients. That is, the only way they communicated with a Backpage client was if the client contacted them first.

Before going on a call, the women would look up the client on Facebook to see who he was and what they could use to extort him. Once at the call, they would

---

[6]McClellan had a similar background.

[7]Some of Pohorence's Facebook posts showed money, jewelry, and statements like "Over 11 thousand in a couple hours. Ladies[,] inbox me."

obtain their agreed-upon payment, ask the client what he (or occasionally, she) wanted, and when he stated that he wanted a sexual act, they would confirm that the client was soliciting them for sex, act outraged to be mistaken for prostitutes, and threaten to expose his solicitation to his wife, his family, his employer, the police, or "anything [they] could find." During the threat stage, they usually told the client that they were recording him, and they actually recorded many of the encounters. According to McMahan, their scheme was based on threats of exposure, and they never threatened to inflict imminent or other bodily injury, to kidnap anyone, or to traffic anyone. However, McMahan also stated that she had been trained to get as much money as possible and to say anything to do so.

The women had more work than they could handle, and while sometimes they left a call with only the initially agreed-upon payment, they usually left with more. They usually made a couple thousand dollars per night, obtaining additional funds by allowing the client to take them to ATMs or, if the client could not access cash, to Wal-Mart, where they would have him buy electronics for them on a credit card. They would also take purses, jewelry, shoes, or clothing belonging to the client's wife or girlfriend.

McMahan described sextortion as the perfect crime because most clients were too embarrassed to call the police. She stated that threats of exposure were more effective on a married client, resulting in more money, and she agreed that they had

9

played a dangerous game. McMahan had been assaulted, and to avoid injury, she would run or threaten to call 911 if a call went badly.

### 2. November 3, 2017

In November 2017, Wall had been the director of quality administration in the psychiatric services department at John Peter Smith Hospital (JPS). At that time, he had been married for eight years, and he, his wife, and their teenage daughter K.W. had been staying with his parents[8] while awaiting their new home's construction. Wall had been a Backpage user since at least November 2016.[9]

On November 3, Wall responded to the women's Backpage ad, and McClellan sent him a text at 2:26 p.m. that said, "okayyy babe." At 2:43 p.m., he escorted McClellan and McMahan from the JPS parking lot to his office, and then ten minutes later, he accompanied them back to the parking lot. The parking lot and the building's entry had video surveillance,[10] which showed that neither woman carried a purse.[11]

---

[8]Although the home where Wall and his family were staying belonged to Wall's parents, we will refer to it as Wall's home for purposes of our review.

[9]Evidence from Wall's phone included texts he had tried to delete: a November 14, 2016 text indicating his interest "in a 2 girl show at 11"; three texts that he sent between September 20, 2017, and October 19, 2017, asking about availability; and a January 21, 2017 text his phone had received, asking him if he wanted "ONE or BOTH OF US." He had also downloaded several "hookup" apps.

[10]Tarrant County Hospital District Police Officer John Hempstead, who was in charge of JPS's security systems, sponsored the surveillance footage and testified that he did not see any weapons on the two women or see them make any sort of threatening posture towards Wall on the video. He also stated that the women's

McMahan noted that meeting at Wall's place of employment was an unusual place to meet a trick. She stated that during the ten minutes and fifteen seconds that they were off-camera and in his office with the door closed, he paid them the agreed $400 and then "got naked" and "pretty much solicited [them]."

McMahan opined that Wall had thought they were prostitutes because although they were ostensibly there for an erotic massage, they did not bring a massage table with them. She recalled that one of their extortion threats to him was to tell his boss because they were at his workplace. However, she stated that they had never threatened to hurt him or to do anything to any member of his family and that they had never threatened to traffic anyone in his family. When they extorted him, he did not put up a fight but instead asked them how much money they wanted. He then accompanied them to some banks, riding in the back seat of the white Honda. A Wells Fargo surveillance video showed him walk in with McClellan and McMahan and stand in a long line.

---

clothing did not look like it could conceal weapons. McMahan testified that they never took weapons—other than information—with them on a call.

[11]During the defense's case, Wall testified about McClellan's purse—specifically, that she had shown him a gun inside of it on November 3 while they were in a parking area without surveillance and that on November 4, during the shooting, it had been on her right shoulder.

McMahan testified that after Wall was unable to access any funds at Wells Fargo,[12] they went to Chase Bank. Wall's bank records showed that he had made three withdrawals from Chase that day: $300 from a downtown ATM before meeting the women and then $4,000 and $2,600 after meeting them. McMahan stated that they had initially demanded $5,000 from Wall. After he gave them additional funds beyond the initial $400 that he had paid for the "erotic massage," McClellan then told him that it was $5,000 each. McMahan stated that Wall's demeanor at the time had been calm, that he had acted like everything was "perfectly fine," and that he had been "completely friendly." After the bank trips, they dropped him off at his office.

McMahan denied knowing Wall's marital or family status or that she knew where he lived. She denied that McClellan had showed Wall a gun in her purse when they took him to the banks in their Honda. She agreed, however, that Wall had been a big score—the biggest at that point in her four months of participating in the sextortion scheme. Pohorence sent them a text at 4:16 p.m. that day that stated, "Y'all's best call yet." Pohorence decided that they should try to tap Wall for more money.

---

[12]The State's evidence showed that K.W. had a teen checking account at Wells Fargo on which Wall was the secondary joint owner.

### 3. November 4, 2017

On November 4, Pohorence contacted Wall, and he agreed to pay more money. They met at the First Financial Bank after Wall sent the bank's address to Pohorence,[13] who sent a screen shot of it to McMahan, who sent the address to McClellan at 6:13 p.m. Pohorence drove to the bank in the white Mercedes; McMahan rode with McClellan in the Honda because they were going on calls afterwards.

McMahan stated that she had stayed in the Honda's front passenger seat, messing with her phone, when McClellan and Pohorence got out of their cars and into Wall's car and that McClellan had left her purse in the Honda's back seat. From what she could see, everything seemed pretty calm in Wall's car, but then McClellan got out of Wall's car, and as she "just walked off casually," Wall got out and shot her. He then went around to the other side of his car and shot Pohorence.

Per the bank's video surveillance, at 6:39 p.m. McMahan drove the Honda out of the parking lot. McMahan testified that she had slid into the driver's seat and had driven to the gas station across the street because she did not want to get killed. A minute later, when she saw Wall drive away, she drove back to the bank and called Payday to report the shootings to him. She did not call 911.

---

[13]On November 4, Wall deleted calls from his phone between 4:54 p.m. and 6:35 p.m., and he deleted texts from his phone between 6:23 p.m. and 6:35 p.m.

Andy Martinez stopped at the bank at 6:43 p.m. to visit the ATM. He called 911 when he saw the two women and the blood on the bank's driveway. He spoke with McMahan and described her as "very upset and nervous and scared." He observed that McMahan had a phone but had not called 911, and he stated, "She looked to me like she was getting something from the young lady laying on the ground, a phone." He saw no weapons at the scene. McMahan told Wise County Sheriff's Office investigator Joseph Oliver—the first officer to respond to the 911 call—that she had heard the shots and that a red car had driven away from the scene.

Parker County Sheriff's Office Crime Scene Investigator (CSI) Heather Huffman photographed the Honda, which had McClellan's Louis Vuitton purse in the back seat and McMahan's Michael Kors purse in the front seat. She stated that McClellan's purse did not appear to have been flung into the back seat, and it had no blood on it.

The Mercedes had a Louis Vuitton purse in the front passenger seat and contained a stack of new laptops in its trunk.[14] Willow Park Police Detective Jaclin Ramirez testified that the police had scoured the parking lot area, the two vehicles,

---

[14]Huffman found a Wal-Mart receipt showing that the laptops had been purchased early that morning for $7,202.78, with $100 cash back. McMahan testified that another Backpage client had paid them off by buying the laptops at 4:26 a.m.

and the vehicles' contents but did not find any weapons or large amounts of cash.[15] Around $120 in cash was found during the autopsies. Two Luger 9mm shell casings were found at the scene. Huffman swabbed McMahan's hands for gunshot residue. McMahan's hands had no gunshot residue on them.

Texas Ranger Anthony Bradford testified that after the Willow Park Police Chief called him at home for assistance with the double homicide, he joined the "deluge" of officers at the scene and conducted a two-hour audio-recorded interview with McMahan. He described McMahan as initially untruthful, stating that she had probably been concerned about her potential criminal liability for other conduct—not the shootings—and that she had "probably [been] afraid to be labeled a snitch -- . . . by the people she was associated with."[16]

At her interview's beginning, McMahan told the ranger about her living arrangements with Pohorence, McClellan, and Payday; that Pohorence and McClellan had told her that they had to meet someone "real quick"; and that she did not know who they were meeting. She initially denied that she had ever seen the man, who she subsequently identified as Wall, before that day. She told him that McClellan had entered the left back passenger seat of Wall's car, that Pohorence had gotten into the

---

[15]McMahan stated that she did not know if Wall had given Pohorence and McClellan any money that day.

[16]At trial, McMahan acknowledged having lied repeatedly during her interview.

car's front passenger seat, and that after Wall shot McClellan and Pohorence and drove off, she contacted Payday and told him about the shootings.

Ranger Bradford noted that during his interview with McMahan, she spent a lot of time on her phone, receiving and sending texts. One of her exchanges was with Jasmine, Payday's adult daughter, who told her by text not to tell the police anything.[17] After McMahan refused a consent search of her phone, the ranger obtained a warrant for it.

Forty-five minutes into the interview, McMahan asked Ranger Bradford for protection in exchange for the truth. She then told him that Pohorence and McClellan had told her they were going to meet "this guy" to talk to him about "some things" but that they did not tell her about what. She denied that they were prostitutes, told him that Payday was not their pimp, and insisted that Payday had nothing to do with the sextortion scheme.[18] She opined that the two women had probably given Wall a massage and he probably owed them money, stating, "They f-cked with the wrong guy" by getting in the car with him.

McMahan finally told the ranger that she and McClellan had gone to "the medical place"—Wall's place of employment—the day before to give him a massage

---

[17]Ranger Bradford opined that McMahan had been more afraid of Payday than Wall based on her "snitch" reference. He did not try to interview Payday or Jasmine and had been unaware that Payday was on federal parole at the time of the shootings.

[18]McMahan testified that Payday was never at the crime scene.

and that he had paid them $400. She identified Wall as the shooter and gave Wall's business card to Ranger Bradford; the business card had been in her purse, which was in the Honda.[19] McMahan also told Ranger Bradford that she and the other women had extorted Wall; that he was supposed to give them more money when they met that day at the bank; that Wall had unlocked his car doors and had let the two women into his vehicle; that McClellan and Pohorence had gotten into and then out of Wall's vehicle; and that Wall had shot them and then drove off.

When Ranger Bradford asked her why it took almost two hours to obtain Wall's identity from her, McMahan told him it was because she was "scared sh-tless" and denied that she was protecting anyone. She told him that she drove to the nearby gas station after the shootings and then returned and shook the bodies to see if they were alive. She stated that they had gone to banks with Wall the day before, and then "[t]oday, they called him and asked for more money and sh-t got real." She stated that they had let Wall believe that they had recorded his soliciting them for sex and that he had been angry about the extortion. She denied that any of the women carried weapons.

Ranger Bradford let McMahan go because her sextortion scheme was a state-jail felony and his priority was the double homicide. A Willow Park police officer

---

[19]McMahan had taken Wall's business card when they visited his office.

drove McMahan back to Payday's house in Arlington.[20] A few days later, McMahan moved back home to Borger. At trial, she identified extortion as Wall's motive for killing Pohorence and McClellan.

Wall's phone showed that he checked local news websites at 8:56 p.m. and at 9:17 p.m. He also deleted his phone's hookup apps that evening.

### 4. November 5, 2017

By 1 a.m. on November 5, the investigators had identified Wall as their capital-murder suspect and had obtained a search warrant for his home and vehicle, which he had parked outside the home. As to Wall's vehicle, Huffman testified about the visible blood and hair that she saw when she looked underneath it. She stated that the front passenger wheel was the only tire that appeared to have been cleaned and wiped down, but she agreed on cross-examination that it would have been a careless cleaning job considering the blood and hair that was left.

Ranger Bradford interviewed Wall at the Parker County Sheriff's Office at around 3 a.m. after giving him the *Miranda* warnings.[21] When Ranger Bradford told Wall that he had been charged with capital murder, Wall said, "What?"

Wall told Ranger Bradford that he had used Backpage, most recently on November 3, when he called for a massage, and two women came to his office. Wall

---

[20]McMahan had neither a vehicle nor a valid driver's license.

[21]*See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).

explained that five minutes in, the women told him to take off his clothes and then told him that if he did not give them $10,000, they would report him to his job, that they knew where he lived, and that they would tell his family. They then took him in their car to three different banks to make withdrawals. When he was only able to secure $7,000 of the $10,000 they wanted, they called him the next day, and he agreed to meet them to pay the rest. He told Ranger Bradford that he had given them another $2,600 when he met them at the bank on November 4.

Wall told Ranger Bradford that four—not three—women had shown up at the bank, that they had walked up to his car and asked for the money, and that they told him that they would think about whether that was enough "for now" and again told him that they knew where he lived. Wall said that he left and that he assumed that they had left too, and he denied knowing anything about a double homicide at the bank.

When Ranger Bradford told Wall that he and his vehicle were on video, that there was blood under his front tire's wheel well, that he had put himself meeting at the bank with the women, and that, based on the bank records confirming the previous day's withdrawals, he knew what "these women were doing to [him]," there was a long silence before Wall quietly said, "I'm not a killer." Ranger Bradford asked Wall how he felt, and Wall stated, "uncomfortable, terrified." When the ranger asked

19

Wall where the gun was, Wall said he did not have it and then said that it was in the safe at home.[22]

When Ranger Bradford continued to ask Wall "why," Wall stated that he should have just told his wife and then stated that the women had threatened—on November 3 and on November 4—to traffic K.W. if he did not cooperate. Ranger Bradford testified that he was surprised that Wall had not brought up the alleged sex trafficking of his daughter earlier in the interview, stating, "Speaking as a father, if someone were threatening my daughter, that would have been one of the first things – if that was playing into my decision to do what I did, that would have been one of the first things I would have said."[23]

Ranger Bradford also opined that if the women had been in the process of attempting to kidnap Wall by removing him from his vehicle and dragging him to theirs, and if the women had displayed or threatened to use a firearm, Wall would have mentioned these circumstances during the interview. But Wall never told him that the women had pulled a gun on him, that they had displayed a weapon during any of their encounters, or that they had tried to physically extract him from his vehicle to

---

[22]During the search of Wall's home, the police found two 9mm guns and a loose magazine in a safe in the garage. Wall's ex-wife testified that those guns were hers and that Wall owned a different 9mm gun.

[23]Ranger Bradford added that although Wall told him that the women were threatening to sexually abduct his daughter, "he was not very forthcoming whenever [Ranger Bradford] questioned him about it."

take him to another location. He also stated that Wall had not provided any context for his statement that the women had threatened to go to his house.

Near the end of the fifty-minute interview, Wall told Ranger Bradford that the women had called him five or six times on November 4, that they mutually agreed to meet at a bank, and that they told him to exit and to stop at the first bank he saw. He said that they had looked through his car but did not get into it. They told him that he did not have enough money, asked him about his credit cards, and told him to figure out the money or they were "going to his house now." He denied that he had shot them.

The police interviewed Wall's family, and Ranger Bradford testified that none of Wall's family had been notified by Wall that he had been involved in the shootings or that he had to engage in self-defense and shoot two women. Wall also did not warn his family that anyone might be on their way to kill them.

### 5. Other evidence

#### a. Cell phones

A City of Weatherford firefighter found McClellan's phone in a puddle of water on November 8, 2017, at the scene of an accident on I-20. He gave the phone to Hudson Oaks Police Officer Marshall Clark, who called the phone's most recent contact—a woman named Jasmine. Jasmine told Officer Clark that he was calling her from a dead woman's phone and that the phone's owner had been murdered in Willow Park. From there, he contacted Detective Ramirez. Officer Clark testified that

someone who was driving westbound—that is, both in the direction of Wall's home and in the direction of Amarillo (near where McMahan's home was)—could have thrown McClellan's phone from the driver's side window.

The police performed "phone dumps" on Wall's phone and the phones belonging to McMahan, Pohorence, and McClellan. An investigator for the District Attorney's Office testified that the phones contained 250,000 data points, which were phone calls, text messages, audio or video files, and GPS locations. The investigator noted that the phones' contents showed no weapons other than a video of the women playing with a stun gun, which he said was more like a $20 toy. He found no "glory shots" that people sometimes take of their guns and money and no threats of violence. The women's phones just showed threats of exposure.

### b. Autopsies

Deputy chief medical examiner Tasha Greenberg testified that she performed McClellan's and Pohorence's autopsies and that both women died from their gunshot wounds. Pohorence had a gunshot wound to the right side of her chin. Dr. Greenberg found stippling—gunpowder tattooing—on Pohorence's chin but found no soot on her and determined that the firing range was intermediate—a few inches to a few feet. McClellan had a gunshot wound to her left forehead and pelvic fractures consistent with having been run over. There was a small amount of soot at the edge of her wound and some gunpowder stippling, putting her shooting within the close-to-intermediate range.

### c. Wall's gun

Over a month after the shootings, on December 9, Wall escorted the police to where he had left the gun—a nearby residential construction site—but the gun was no longer where he had left it, and the police were unable to locate it.

### d. The McKinney incident

Detective Ramirez testified that a June 8, 2017 incident reported to the McKinney Police Department involved an allegation that Pohorence and McClellan had shown a pistol inside a purse to a client and that a black man got into their car with a handgun. However, no charges were filed in the McKinney incident, and the police report stated that the women did not have purses, that no black man was present at the time, and that no weapons were present in any of the videos obtained in the case. The incident's video footage had been from a hotel's common area and an ATM outside a gas station; the complainant's report had stated that the women had shown the client a gun inside a purse while they were in a hotel room, but the video footage from the common area did not show the women with purses. Detective Ramirez testified that according to the report, the McKinney incident's allegations of purses, black males, and weapons were ultimately unfounded.

## C. Defense's case

Wall, K.W., Wall's mother Rosemary,[24] his ex-wife Angela,[25] Ryan Sandman (a sextortion victim), and three experts testified during the defense's case.

### 1. Wall's testimony

Wall, age 38 at trial, testified that he had been a registered nurse for over fifteen years, had an associate degree and a bachelor's degree in nursing, and had an MBA with a focus on healthcare management. At the time of the offense, he, his wife, and K.W. had lived with his parents for two months and had another four months to go while their new home was built.

Wall had been a director of behavioral health quality administration at JPS. On his office's walls, he had a large photo of him and his wife, with K.W. in the middle, and another photo of him with K.W.[26] Wall did not recall the details of his work on November 3 but stated that at some point that day he had decided to call a phone number listed in a Backpage ad that offered two girls for a massage.[27] He met

---

[24]Because Wall's mother and ex-wife have the same last name, we will refer to them by their first names to avoid confusion.

[25]Wall filed a divorce petition in May 2021.

[26]During cross-examination, Wall agreed that his diplomas were on his office's walls.

[27]Wall acknowledged his phone's "[s]hameful, embarrassing" messages and apps and stated that he used websites like Backpage several times "roughly about 12 to 18 months" before the shootings.

24

McMahan and McClellan on the side street outside his office building and walked them into his office, where they looked around and grabbed candy from his candy jar.

He gave McClellan and McMahan the massage's $400 price, and they asked him to take off his clothes. Wall undressed to his boxers, and they instructed him to straddle one of his chairs and to sit facing the wall, but they did not take off their clothes. Then they asked him what he wanted to do, and he "made an offhand comment saying, ['I]t would be nice if you took your clothes off too.[']" Then McClellan whispered in his ear, "[D]id you think we were prostitutes?" He turned to look at her, and she had an offended look on her face. When he tried to get up and put his clothes on, they told him to sit back down, and McClellan walked to the door, grabbed the door handle, and told him that if he did anything else, she would open the door and scream rape.

McClellan directed McMahan to go through Wall's pockets, and they went through his desk drawers and filing cabinet and made offhand comments, like pointing out that he was married and had a child. They found a letter with his home address in his pocket and pointed out to him that they knew where he lived, and they went through his wallet and found his bank cards. McClellan demanded $5,000 from him. When he told her that he did not have $5,000 on him, she replied, "[N]o sh-t. You're going to come with us. We're going to go to a bank, and we're going to make a withdrawal." They told him that if he did not pay them $5,000, they would open the door and scream rape and tell his employer and family, and they threatened that they

knew where he lived.[28] In response, he was compliant and did exactly what they told him to do.

When the women walked him out to the parking lot, they told him, "Don't act a fool. We know how to handle a fool," and as they got into the white Honda, McClellan pulled out a normal-sized handbag and showed him a handgun inside. He sat in the Honda's rear passenger seat behind the driver, and they drove him to the Chase Bank off of Hemphill. Wall stated that on the way to the bank, he could not have gotten out of the car because the child locks were engaged. At the Chase ATM, he unsuccessfully attempted to withdraw various amounts until they eventually parked the car and escorted him into the bank, where he was able to withdraw $4,000.

Wall stated that when he gave the $4,000 to McClellan, she changed her demand from $5,000 to $10,000. When he told them that he had withdrawal limits, they threatened him again, reminding him that they knew where he lived, and they told him that they would go to his house and that if he could not pay them, "they would pimp [his] daughter out," and she could pay them that way. He was "[s]cared, terrified, [and] disgusted" by their threats, and he believed them because when they walked into another bank, they showed him photos of his family's house on a phone. McClellan and McMahan had been in constant communication with a third party via

---

[28]During cross-examination, Wall agreed that they had obtained his address from the envelope they had found in his pocket. In contrast, McMahan testified that although she knew where Wall worked, she did not know where he lived.

their phones, and he stated that at that moment, his thoughts were, "They've got a gun. It's clear they've been talking to other people while we've been in the car."

They had seen a Wells Fargo card in his wallet and demanded that he accompany them to a Wells Fargo, even though he told them that he did not have an account there—the Wells Fargo account was a joint ownership account that belonged to him and K.W. They went into the bank and stood in a long line. When they reached the teller, Wall was unable to withdraw any money, and the women took him back to their car where McClellan yelled at him, "[D]o you think this is a game?" He replied that he had told her that he did not have a Wells Fargo account. McClellan then told him, "I can send someone to your house right now," and started to walk away to make a phone call. After he begged her, stating, "I'll try anything," she told him that they would go back to Chase. They went to a different Chase bank, off of I-30 and Beach Street, and when he was unable to make an ATM withdrawal, they marched him inside where a bank supervisor had to approve the $2,600 withdrawal.

Wall gave the women the additional $2,600, which brought that day's total to $7,000. They kicked him out of the Honda half a mile from his office, told him, "[H]ope it's enough. We'll be in contact if we need more," and then drove away. He walked back to his office, drove home, and went to the movies with his wife. Wall thought it was over at that point except for having to tell his wife about the $7,000, and he did not tell her about it that night because he was ashamed and embarrassed.

The next day, the women called him around 4 p.m. and told him that they wanted more money. They told him that they had someone within ten minutes of his house and that if he did not come up with more money, they were going to send someone to his house. The first place they told him to meet them was a steakhouse on Fort Worth's east side, but when he told them it would take him an hour to get there, they changed the location. They called him multiple times, and during one of their conversations, he heard one of them whisper his parents' address to the person with whom he was speaking, and then that person re-verbalized it to him.

Wall said that he had $2,600 in cash in his safe in his parents' garage from selling some equipment in July or August 2017. He took that cash and got into his car, and they called him again while he was on I-20. They told him to take the first exit that he saw, which was the Hudson Oaks exit, and told him to look for a bank where they could meet. He said that they had been very intense and yelled at him. When he found the bank, they told him to stop there. He got out of his car to find the building's address and then sent it to them. Then he waited another twenty minutes for them to arrive.

Wall said that during the twenty-minute wait, he had felt helpless and scared—it was around 6:30 p.m. on a Saturday, so the bank was closed—and he drove around the bank's parking lot while waiting. His intention, at that point, had been to give them the $2,600 from his safe to keep them from coming to his house. The women parked two vehicles on the bank's east side and then he parked his car perpendicular

to theirs and slightly rolled down his driver's side window to hand them the envelope of cash. He stated that he saw four women—two in each vehicle. Pohorence emerged from one of the vehicles, and McClellan from the other. In contrast to what he told Ranger Bradford in his interview—that the women did not get into his car—Wall testified that Pohorence got into his front passenger seat and that McClellan got into the back seat behind him. They took the money from him. He had never seen Pohorence before, and when he asked her who she was, she told him, "I'm the girl from yesterday, and I'm the girl tomorrow," making him feel like the sextortion was never going to end.

Pohorence counted the cash and then handed it to McClellan to count, and they told him that it was not enough. At that point, he felt like they were back to square one, and he was scared. Their threats at that point were no longer that they were going to tell on him; instead, "they ha[d] completely honed in, and they ke[pt] talking about [his] daughter." They told him that if he could not come up with the money that day, they were going to go to his house and take his daughter. Pohorence told him that they knew guys who liked girls his daughter's age. Wall testified that he had been mortified and scared when they threatened to sex traffic his daughter and that he had absolutely believed them. McClellan then told him, "[Y]ou're going to back up, and you're going to park right here." He complied with her demand.

Then the women told him that he was going with them, and McClellan took his cell phone and wallet, which had been in his car's cup holder, and they started running

through his credit card numbers. One of them made a call or text using his phone. Pohorence turned his car off and took the keys, telling him that he was not going to need them and telling him, "[F]-ck with us, and you're dead."

Wall testified that he had felt that they were serious and that his life and K.W.'s life were in danger. When they had his keys, his phone, and his wallet, they told him to get out of the car and into the Honda, where he could see McMahan in the front passenger seat and a person's silhouette in the back seat. Pohorence threw his wallet at him.

Wall stated that McClellan got out of the back seat, opened his car door, told him to get out, told him that he was going with them, tried to pull him out of his car, and then walked around to the car's other side. As he got out of his car, he grabbed his handgun from underneath the driver's seat, where he kept it to use for protection. He walked within line of sight of McClellan, cocked the gun, pointed it at her, and told her he was not getting into the Honda. Wall said that he did this because he did not think he would return if he got into the car with them.

Wall said that McClellan had what appeared to be the same handbag from the day before—the one with the gun inside—on her right shoulder. She told him that would be the last mistake he ever made, and when she reached into that bag and made a sharp, quick movement back towards him, he fired his gun. He stepped in front of where McClellan landed and told Pohorence to get out of his car, to drop his keys, and to go around. As Pohorence got out of his car, he did not intend to kill her, but

then she charged at him and tried to grab the gun. He pushed her back, raised the gun, and fired. While he was picking up his keys and phone, he saw McMahan back up the Honda and drive off. Wall then testified as follows:

Q. How quick did all of this happen?

A. Seconds.

Q. Did you feel like the danger was imminent?

A. Yes.

Q. Did you feel like if you didn't act, your life was in danger?

A. Yes.

Q. Did you feel like if you didn't act, [K.W.'s] life was in danger in that moment?

A. Yes.

Q. Do you feel like if you would have gotten in that car that your life was in danger?

A. Yes.

Q. What did you do next, [Wall]?

A. I got in my car and backed out to leave.

Q. Did you hit anything on the way out?

A. I did. I did actually back over [McClellan]. I didn't realize where she was.

Q. How did that feel when you did that?

A. It was -- really, I was already in shock. Like, it took me a second to even process what had just happened as I back[ed] over it. It was just like a big bump, and then I see where she's at, and now I tried to go around it, but --

Wall denied that he had picked up McClellan's cell phone and thrown it from his car on his way home. He drove home first, circled the block two or three times, and then drove to a nearby gas station that had a carwash and went through the carwash "[t]o hide" because he was not thinking clearly. He denied having tried to clean his front tire and stated that he had not been aware that there was blood and hair on his car's underside.[29] The trial court admitted into evidence photos of his vehicle's driver's side and passenger's side front tires, which appeared identically clean.

Wall said that when he returned home from the carwash, he parked in the driveway, walked into an open field, and put the gun under what appeared to be "a black piece of plastic or tarp or something in this brush pile." Then he walked back home, went inside, and briefly spoke to his father about a football game. He did not tell his father what had happened at the bank because he was still trying to process it and was "freaking out on the inside." He felt sick, thought about calling the police a couple of times, and decided that once K.W. went to a birthday party the next day, he would retrieve the gun, call the police, and turn himself in. Instead, he was arrested and interviewed by Ranger Bradford.

---

[29]During cross-examination, Wall insisted he had gone to the carwash because he needed a place to think, stating, "The evidence was all over my car, sir. If [destroying the evidence] was my intent, I would have gone to a manual car wash, but that was never my intent." He acknowledged that he understood why that might be hard to believe.

Wall said that the arrest process was traumatizing and that he had already been extremely traumatized by the shootings. He blamed the trauma for his denial to Ranger Bradford about knowing about the double homicide, stating, "I was guarded. I was scared. I wasn't for sure what to trust at that point. I didn't know him; he didn't know me. There was no rapport there. And in my mind, I don't feel like -- I'm not, like, a cold-blooded killer." Wall then testified as follows:

> Q. Okay. When you -- why didn't you tell him about -- why didn't you tell him about these threats they made?

> A. I did start to walk through what happened the day before and some of the threats, and then I started getting interjected with, is that what made you snap? Or he'd say, I get it. Almost -- it was almost like a statement of, like, he would do it himself kind of thing. Like, I didn't feel comfortable responding to that.

> And I knew I was in trouble. I wasn't thinking clearly at the moment. I needed -- I needed to reflect. I needed to think and at least clear my mind and talk to somebody before I just start[ed] saying stuff.

Wall stated that in previous encounters with women whom he had solicited, he had never had any problems. He denied having killed McClellan and Pohorence because he did not want his wife to find out, stating that he knew he was going to have to talk to his wife about it. However, during cross-examination, Wall agreed that during his interview, he had told the ranger that the women had been extorting him and that he did not want them to tell his employer or his wife.

Wall agreed during cross-examination that twenty-three minutes into the interview, he mentioned the human-trafficking threat and that, if that had been the

main reason why he had killed them, he should have mentioned it sooner. When Wall disagreed with the prosecutor that there were "a lot of convenient things in this story that just so happen to be things [they could not] verify by any sort of actual evidence," the prosecutor asked him about the $2,600 cash that he had allegedly given to the women on November 4 and asked about the person to whom he had allegedly sold the equipment that had generated that cash. When the prosecutor asked Wall if the person to whom he had sold the equipment was going to testify, Wall replied, "I can't speak to that, sir."

The trial court sustained Wall's counsel's objection when the prosecutor asked, "When you were going through your testimony with your lawyer, did you cry in the same parts of the story every time?" Wall admitted that he and his counsel had gone to a criminal-law course about creating a psychodrama where they went through his story and gave him feedback on how to effectively tell it.

Wall agreed that any of the information his expert witnesses might share would be information that he did not know at the time he killed the two women. He stated that he had never spoken with his family about the case's details but conceded that he had eventually told them that he had been involved in buying sex because "that kind of became apparent" once he was arrested, and he apologized for misspeaking. The following dialogue then occurred:

Q. Did you, basically, portray yourself as the victim?

A. No.

34

Q. Do you feel like you're the victim in this case?

A. I am a victim in this case.

Q. But the true victims are the two people that you killed?

A. I disagree with that.

Q. They're not victims?

A. Not in the sense that you're trying to portray them as, no.

. . . .

Q. So to be clear, you are admitting that you intentionally caused the death of Ashley Pohorence and Krista McClellan by shooting both of them with a firearm in the same incident on November 4th, 2017, at the bank in Willow Park here in Parker County, correct?

A. I know I shot them, but I think I'm misunderstanding about the intent.

. . . .

Q. All right. And you know that when you point a firearm at somebody and pull the trigger what is likely to happen?

A. It's likely to cause a death.

Q. Correct. Obviously, you knew shooting someone is an act clearly dangerous to human life?

A. Yes, sir.

Q. . . . So you intended to shoot them, correct?

A. Yes.

Q. Okay. And I guess is the difference that you're making that you didn't really intend to kill them?

A. Well, that's what I was trying to understand your -- what you were trying to tell me or ask me.

35

Q. Well, you did intend to kill them, right?

A. At the point that I fired the gun?

Q. Yeah.

A. Yes, sir, I did.

Q. Okay.

A. Used deadly force.

Q. Okay. For some -- this is not a trick question, I promise. You shot them both in the head. I think your intent's pretty clear. When you shot them, you meant to kill them, right?

A. Yes.

Q. Okay. So, basically, though, we're having a trial here because you're claiming that your murdering them was legally justifiable, right?

A. Yes, sir.

. . . .

Q. Like, what theory of legal justification are you using for shooting and killing [Pohorence] and [McClellan]?

A. It was self-defense against robbery, kidnapping.

Q. Okay. So self-defense is the theory you're going with?

A. Yes, sir.

Q. Okay. And at the point in time where you shot and killed them, there was nobody else there with you, right?

A. Correct.

Q. And there was nobody else that you knew and cared about within 10 to 15 minutes' worth of driving time from you right?

A. That's not correct.

Q. Who else did you care about that was within 10 to 15 minutes of driving time at the time you shot and killed them?

A. My family.

Q. And they're about 10 to 15 minutes away, right?

A. They're about 10 minutes away, yes, sir.

Q. Okay. And, obviously, all that depends on traffic. We've all been stuck on [I-]20.

A. Correct.

. . . .

Q. . . . [B]ut they weren't there right there with you. Nobody in your family was, right?

A. No, sir.

Q. Just you?

A. Yes, sir.

Q. So there is nobody else in your family that was under imminent threat of being harmed at that time, correct? Just you?

A. To me, if I'm being removed from the equation, I have no way to combat or stop that if they're taking me away.

Q. Okay. We'll come back to that in a minute. But as far as imminently, right there, right then at that time, okay, there was nobody else there that they could hurt, was there?

A. At that moment, no.

Q. And you would admit, wouldn't you, that you never saw a gun in the hand of [McClellan] or [Pohorence] that day, correct?

A. No, sir, I did not.

Q. And you never saw -- actually, in fact, you never saw any gun at all on November 4th of 2017, did you?

A. On November 4th, I did not.

Q. Correct. And they didn't have any other weapons, any kind of knives, any kind of clubs, any kind of -- I don't know -- tomahawk, whatever else, no other weapons either, did they?

A. I would not know.

Q. But you didn't see any?

A. I did not see them, no.

Wall also agreed that he had never met or seen Payday and had not known of Payday's existence at the time of the offense.

Wall acknowledged that although he and his wife had cheated on each other, she had not known that he had been using prostitutes for sex. He had used Backpage for most of his hookups—more than ten—and did not expose this to his coworkers, his family, or his friends at church. He usually met his Backpage companions at a residence or hotel; the instant case had been the first time he had ever taken anyone to his office at JPS.

Wall agreed that on November 3, he had probably started looking at Backpage while he was at home and then at some point he continued to do so at work because he had met with the women mid-afternoon. He agreed that the risk of receiving sexual services at work was part of the thrill, that he would have been terminated immediately if his employer had found out, and that this might have made it difficult for him to find a new job. He had most of his previous Backpage encounters during

work hours, either by using an open calendar spot when he did not have a meeting or by taking a late lunch.

On the night that he shot Pohorence and McClellan, Wall deleted all his messages with them from November 3 and 4, as well as his messages with other prostitutes. The deleted messages were recovered by the State. When Wall claimed that this incident had been the first time he had been extorted, the prosecutor asked him about a February 9, 2017 text to his phone by someone named Kate. Kate's text had stated, "[I]f you wouldn't be opposed to leaving some cash somewhere, I wouldn't be opposed to losing that report this one time. However, if you accept my offer, I better not see you soliciting sex on here again because that offer will not be extended twice." The reply from Wall's phone stated, "[W]here[?]" Wall twice claimed that he did not recall receiving Kate's text. He nonetheless said, "That's fair," when the prosecutor asked him if—on November 3—he had considered paying off prostitutes a cost of doing business.

The prosecutor counted up the women's November 3 threats as follows: to tell his employer; to scream rape in his office; to tell his wife; showing him a handgun and warning him that they knew how to handle a fool; to pimp out his daughter if he could not pay; and to send someone to his house when they left Wells Fargo, which Wall testified he had interpreted as "that they were going to get [his] daughter." The prosecutor then noted that Wall did not tell Ranger Bradford about the threat to scream rape or the handgun/fool threat, that he did not tell the ranger about the

trafficking threat until twenty-three minutes into the interview, and that he did not tell the ranger about the last threat until "far into the recording."

Wall stated that he had taken these threats seriously and had been worried when he went home that day, but he agreed that he had done nothing to keep his family safe from the threatened actions. He agreed, "That's fair," when the prosecutor stated, "What you did by not telling [K.W.] anything and by letting . . . her out of your sight is not consistent with somebody who's continuing to be worried that their daughter's going to be trafficked; isn't that true?" Instead, he and his wife went to a movie and let K.W. go to a football game with her friends.

Wall testified that when the women contacted him on November 4, it had occurred to him to tell family, friends, or the police but that he did not, even though he had around an hour from the time the women first contacted him until he met them at the bank. He denied that he had been less worried about his family's safety and more worried about people finding out. He agreed that he knew that he had a gun under the driver's seat the whole time he was waiting at the bank but denied that he had thought at that point about shooting them. Wall insisted that he had believed McClellan had a gun when she opened his car door and started tugging on him, although he did not see a gun that day. Wall stated that when she told him that it was the last mistake he would ever make and reached into her purse, he believed she was retrieving the gun that she had showed him on November 3. He agreed that he did not mention the gun to Ranger Bradford at all during his interview.

Wall said that he did not look through McClellan's purse after he shot her and that he knew the police had not found a gun at the scene. He agreed that he did not see any blood on the purse, State's Exhibit 164B, when the prosecutor showed it to him. When asked if Pohorence had a gun, Wall replied, "Not that I'm aware." He said that he shot her when she "came at [him] and tried to take [his] gun."

When asked about hiding the gun, Wall said that he had not been thinking clearly and that he "just wanted the gun out of [his] sight" because killing two people had been "upsetting for [him]." He noted that he had later tried to inform the police where to find the gun. Wall had retrieved his phone after he ran over McClellan, but he denied having picked up McClellan's phone or having anything to do with its distance from the crime scene and claimed that McMahan could have taken it and then disposed of it later. His phone showed a call to Wells Fargo that day at 6:37 p.m., and Wall said that McClellan had made that call.

During his cross-examination, Wall acknowledged that he had lied several times to the ranger: when he said that he did not know why he was arrested, first at his house and then at the station after receiving his *Miranda* warnings; when he denied knowing about the double homicide; when he gave the ranger the impression that when he left the scene after giving money to the women, everyone had left the scene; and when he denied having shot them. He agreed that he had said nothing to the ranger about self-defense.

41

During redirect, Wall stated that he had been worried that if he got into the women's car, they were going to kill him and that he had been worried about his family, stating, "I seriously thought they were going to send someone to my home and take my daughter." He testified that he had seen McMahan at the bank on November 4 but that he did not shoot her because she had not made any threats towards him at that point. He stated that he did not lie to the ranger about Backpage, the money, or the threats to K.W. or to come to his house. He said that the interview had been around 3 a.m. and that he had been scared and unable to think straight. When the police came to his house, they had used a megaphone to order everyone outside. He was the first person outside, and when he went out, he could see "green, like, optical lasers all over [him]." One or two officers from each side converged on him. The officer with the megaphone told him "come to my voice" and then told him to get down on his knees in the street, and he had no idea how many guns were pointed at him. When he got confused, someone stuck a gun in his face and screamed at him to put his hands on "his f-cking face." He gave the ranger his phone and passcode when the ranger asked for them.

During recross-examination, Wall agreed that he did not tell the ranger that the women had taken his keys, phone, or wallet or that they had been trying to abduct him by moving him from his car to theirs.

42

**2. Testimony by K.W., Wall's mother, and Wall's ex-wife**

**a. K.W.**

K.W., age 19 at trial, had known Wall since she was three or four years old. She described her adoption by him—not quite two years before the shootings—as "[p]robably the best day of [her] life." She had never seen him be violent or angry and said he was very protective of her. K.W. did not recall anything about the night of November 4 because she had been getting ready for her best friend's birthday the next day.

During cross-examination, K.W. stated that on November 4, someone had stared at her and Angela from the opposite side of a stop sign that afternoon as they walked into their house. The following dialogue ensued:

> Q. It's your testimony today that somebody was staring at you and your mom outside your house the day before your dad gets arrested for capital murder? Yes or no.
>
> A. Yes, ma'am.
>
> Q. And you never told law enforcement that, did you?
>
> A. No, ma'am.
>
> Q. Okay. What did this person look like?
>
> A. I couldn't see what the person looked like. I couldn't see.
>
> Q. If you can't see what the person looks like, how do you know they're staring at you?
>
> A. Because I could see -- like, I can't tell if- the person -- I don't know. I can't explain it.

Q. Okay. So other than that random person that may or may not have been staring at you that you can't describe, when you got home from Dollar Tree, did you go inside and call the police?

A. No, ma'am. I wasn't really thinking of it.

K.W. did not tell Wall or her grandparents about this incident.[30]

### b. Rosemary Wall

Wall's mother Rosemary stated that Wall hated violence, that he had always tried to de-escalate everything he possibly could, and that he and his wife had kept their guns in a safe in the garage, in contrast to Wall's testimony that he had kept his gun in his car for protection.

Rosemary testified that on November 3, Wall had gone to a movie with his wife while K.W. went to a football game with her friends. She told the police that on November 4, Wall had left the house between 5:45 p.m. and 6 p.m. and was not home for dinner. When he came home, he was not hysterical. He did not tell anyone that he had shot someone, that he had been extorted, that he had run over someone and had taken his car to a carwash, that he had disposed of the murder weapon in a nearby development, or that he was concerned that someone was going to come to their house and put them in danger.

---

[30]Wall's parents kept guns in their bedroom, and Wall's father was a part-time volunteer in a police department's Citizens on Patrol program.

### c. Angela Wall

Angela and Wall had divorced a year before trial, and she expressed her regret about the divorce, stating "[H]e's a wonderful man, a wonderful father, a friend. I mean, any woman would be lucky to be with him, and I regret every day not being with him." Both of them had been having affairs during the marriage. She denied that Wall was a violent person and said that she had never seen him get angry. Angela described the relationship between Wall and K.W. as very close and stated that K.W. had asked Wall to adopt her in 2014 or 2015.

Angela testified that November 3 had been a normal day—Wall had gone to work at JPS where he was "some sort of administrator." They went out to a movie that night because they had needed some one-on-one time away from K.W. and his family. During cross-examination, Angela agreed that on November 3, Wall had not told her that he had solicited women to his office from Backpage; that the women had claimed that he had solicited underaged girls for sex and had threatened to expose him at work or to her; that they had threatened her and K.W.; that they knew where Wall and his family were living; that they had demanded money and had shown him a gun; that he had gone to multiple banks with them; or that he had taken thousands of dollars out of their joint account.

Regarding a text message Angela had sent to K.W. before K.W. went to the football game that night with her friends—to make sure of her surroundings "with all the crap going around and sex trafficking"—Angela stated that she always warned

45

K.W. to be careful of her surroundings because Angela had been involved in an organization against sex trafficking "off and on for years."

The next morning, they ran errands as a family and bought party supplies for the following day. Angela then suffered a bout of food poisoning and had limited conversation with Wall that evening when he got home because she was not feeling well. He did not tell her when he left that he was going to meet some women or that someone was threatening him, and when he returned home, he did not tell her what had happened. Her first notice was when the police came to the house.

### 3. Sextortion victim

The defense called Ryan Sandman, a 37-year-old software salesman who had used a Backpage ad to find a prostitute to come to his house and who identified Pohorence and McClellan as the two women who had shown up at his door. They were nice at first but then threatened him. McClellan had leafed through his mail and had threatened to tell his (now ex-)wife that he was soliciting sex from minors. When he asked them to leave, they began tossing his house, looking for valuables. When he told them that he did not have any money, they asked him if he could get some from his parents.

Sandman testified that when he started going through his phone, they told him, "you don't want to do that because if our man comes up here, at best, you'll get pistol-whipped." He believed that they had someone outside with a gun and said that it made him feel completely and utterly helpless. He stated that the biggest trauma

occurred when they told him that they were going to tell his wife or go to his kid's school or when they told him that they were going to keep coming for money, and he stated that they were very convincing and professional and that he got the sense that they had done this many times before. But he also stated that he was more worried about the threat of someone outside with a gun than the threat of exposure.

They took his ex-wife's Louis Vuitton and Yves St. Laurent purses, her old cell phone, and his ukelele. The ordeal lasted around forty-five minutes, and he did not call the police. He told his ex-wife that they were robbed. His ex-wife's phone was found in one of the cars at the murder scene.

### 4. Experts

#### a. Daniel O'Kelly

Daniel O'Kelly, the director of the International Firearms Specialist Academy and former police officer and ATF agent, defined "use of force" and explained its use. O'Kelly walked through a variety of hypotheticals, including the following:

> Q. . . . So what if I tell you to get in my car now and you believe that if you get in my car, you're never going to make it out alive? You have that belief.
>
> A. If you've gone far enough to make me believe that, I have every right to use deadly force.
>
> Q. Okay. So – and that's the point. It depends on – each situation can be different. It depends on its own facts.
>
> A. Correct. It's going to depend on what a person says, how they say it, are they armed, what are they armed with. It depends on the totality of the circumstances.

. . . .

Q. Okay. Could a threat to kidnap someone's child who may not be physically present but could be nearby somewhere like at a home somewhere, and the person making a threat says, I know where your child is, or I know where your child lives, could that be considered an imminent threat in certain circumstances?

A. I would call that thin, but it is possible because if someone said that to me, even if I know you're carrying a gun, you know, my attitude is, well, you're not any closer to them than I am. . . . And I still have the ability to call and warn them, rally other people at the location where that child is, et cetera. However, if you have taken away my ability to communicate and travel or one or the other, that would change things in my favor.

. . . .

Q. And what if – same situation on top of that. I threaten to send someone to go kidnap your child and traffic her, and your child is 10 minutes away. You no longer have your phone and your keys. Does that lower the threshold?

A. That lowers it a lot.

. . . .

Q. Now, if a person had just acted in what he believes to be a self-defense shooting and another assailant tries to take his gun, would that create a very dangerous situation for the person doing the shooting if the assailant does actually get his gun?

A. Of course. Because what purpose is there in taking your gun other than to use it against you?

O'Kelly opined that Wall had exercised the reasonable use of deadly force against McClellan and Pohorence. On cross-examination, however, he acknowledged that he had not heard any of the State's case and agreed that if the women had never

48

showed Wall a gun and if McClellan did not have that purse containing the alleged gun when she told him to get out of his car, "then yes, that would change everything."

### b. Everett Baxter

Everett Baxter, a certified CSI who owned a forensics education and consulting company, testified as an expert in blood-spatter issues and shooting reconstruction. From the physical evidence, he had generated three-dimensional diagrams to show the positions of Wall, Pohorence, and McClellan at the time of the shootings. However, he was not provided with the autopsy photos and had been wrong about the location of McClellan's head when he formulated his images. He stated during cross-examination that he thought distance had been accurately depicted but that he would "just need to rotate [McClellan's] head." He agreed with the medical examiner's findings that there had been an intermediate distance between Pohorence's face and the gun's muzzle.

Baxter's exhibits showed that Wall shot Pohorence while she was trying to get out of his car. During cross-examination, Baxter stated, "She would have been coming out of that [passenger front] seat, so she would be low . . . as she was coming out, rising." Baxter agreed that Pohorence's opening Wall's passenger car door would have boxed her in between Wall's car and her Mercedes.

### c. Samuel Montana

Samuel Montana, a former Homeland Security special agent and criminal investigator, testified that he had worked on prostitution cases in North Texas. He

opined that Payday had been the women's pimp, that McMahan had lied when she said that he was not involved in their crimes, and that "purses in this type of environment mean something. . . . These are Payday's rewards for good work."

Montana testified that in 2009, Payday had been convicted for money laundering with the underlying offense of prostitution. On November 4, 2017, Payday was on federal probation, which could have been determined with very little investigation. Montana stated that he saw no investigation of Payday by the officers in the instant case.

Montana opined that after the women reported to Payday on November 3 about Wall's office in the hospital, Payday sent Pohorence to get more out of him and that the women would have said and done whatever they needed to for Wall to submit. Montana stated that he had seen evidence that the women used guns based on the McKinney police report and Sandman's testimony. He testified that he "never saw anyone carrying a weapon" in his prostitution investigations but asserted that actual prostitution was different from sextortion in that a prostitute's carrying a weapon could be bad for business.

During cross-examination, Montana agreed that Sandman did not say that he saw a gun but rather that the women had told him that they had a gun.[31] He did not recall seeing the detective's report from the McKinney incident, in which the detective

_____

[31]Sandman's actual testimony was that the women implied that a man outside had a gun, not that the women said that they were carrying a gun.

stated that there had been no purses and no black man on the video; Montana had seen only the two-page synopsis of the McKinney victim's claim. He also agreed that he had reviewed the phone dumps and did not see violence directed by the women at anyone or possession of any weapon other than the play stun gun.

On redirect, Montana stated that the women would not have texted about weapons or drugs[32] because that would have incriminated them. He opined that Wall's case was different from their regular sextortion work because of the potential amount of money they could have obtained from him.

## D. Analysis

### 1. Self-defense and defense of others

In his third and fourth issues, Wall argues that the evidence is insufficient to prove that he committed capital murder because the State failed to prove beyond a reasonable doubt that he did not act in self-defense or in defense of K.W. Wall contends that "[t]his case turns mostly on and after the instant that [McClellan] and [Pohorence] entered [his] Hyundai at First Financial," that McMahan was not credible,[33] and that his version of events, in which he believed that his life and K.W.'s

---

[32]On recross, Montana stated that he did not count "weed" in his drug comment and acknowledged that the women's text messages were rife with references to weed.

[33]In his reply brief, Wall calls McMahan "a confirmed liar, extortionist, trick-roller, and criminal," and asserts that "no rational factfinder would have believed her version of what occurred."

life were in danger, "is the only one." He asserts that his exercise of deadly force was proper based on O'Kelly's testimony and that Baxter's testimony corroborated his version of events.

When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594. The jury resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given to their testimony. *Gaona v. State*, 498 S.W.3d 706, 709 (Tex. App.—Dallas 2016, pet. ref'd) (stating that even if the court assumed that the appellant's version of events would be sufficient to justify his use of deadly force, other evidence disputed that version and supported the jury's rejection of his self-defense claim). We may not act as a thirteenth juror and must not disregard, realign, or reevaluate the weight and credibility of the evidence. *Fountain v. State*, 604 S.W.3d 578, 583 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (discussing evidence to support jury's rejection of self-defense claim). The jury, as factfinder, is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because the jury has the opportunity to observe the witness's demeanor and appearance. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *see also Braughton*, 569 S.W.3d at 612 ("The jury was free to evaluate Gina's testimony and disregard mistakes or inconsistencies while crediting other portions of her testimony.").

Here, it was undisputed that Wall intentionally shot McClellan and Pohorence in the same criminal transaction on November 4. The jurors were entitled to believe

some, all, or none of the testimony of the only two individuals—Wall and McMahan—who knew what had happened that day in the bank parking lot and what had happened the day before.

The jurors could have compared Wall's physical size to that of his purported assailants and could have determined that his story that one of them had showed him a gun in her purse the day before was unbelievable or that—particularly based on its lack of blood stains and its position in the Honda's back seat—McClellan's purse had never made an appearance when he drew his gun on the women on November 4.

The jurors could have counted Wall's lies during his interview with Ranger Bradford, compared his interview to his trial testimony, and determined that he was less credible than McMahan despite her own, less directly relevant lies to Ranger Bradford. The jury could have found Wall's version of events less credible when Wall did not mention his defense-of-others claim—the alleged threat to traffic K.W.—until twenty-three minutes into the interview and when he never told the ranger that the women had pulled a gun on him or that they had displayed a gun during any of their encounters. The jury could have also determined that the lack of immediacy defeated his defense-of-others claim because K.W. was not present in the bank parking lot, *see Henley*, 493 S.W.3d at 89–90 (describing immediacy as "when a split second decision is required"), particularly if they did not believe that the women were armed or that they had taken his car keys and cell phone.

The jurors could have found that Wall had a stronger motive than self-defense and defense of others to shoot the women, i.e., to prevent their continued extortion of him and to keep his employer from finding out that he had brought who he thought were prostitutes to his workplace for sexual services. And they could have completely disregarded his family members' testimonies that he was not a violent, angry person.

The jurors could have determined that if any of the women's threats had actually been made as represented by Wall, Wall would have taken some sort of action to notify or warn his family. Wall took no action to warn his family; instead, he allowed his daughter to attend a football game while he went to a movie with his wife on November 3, and then on November 4, he visited a carwash after running over McClellan's body and then hid the murder weapon. Thus, the jury could have reasonably concluded that his claimed justifications were post hoc rationalizations.

Further, the jury could have chosen to disregard the testimony about the McKinney police report, which was never offered into evidence, when Detective Ramirez testified that the incident was unfounded. The jury could have also chosen to give minimal credence to Sandman's testimony about Pohorence and McClellan's threat that he might be "pistol-whipped" by a man outside when he also testified that he never did anything to confirm that the man existed, and the women's phones showed no evidence of any weapons beyond a toy-like stun gun.

And the jury could have determined that McMahan had insufficient time to find and dispose of a gun in McClellan's purse, to clean up McClellan's purse and place it back inside the Honda, to find and hide McClellan's phone, and to find and hide the $2,600 that Wall claimed he had given to McClellan and Pohorence before shooting them, all without getting blood or gunshot residue on her hands. Although Wall asserts that his failure to shoot McMahan supports his defensive arguments, the jury could have determined otherwise, i.e., that McMahan drove away before he had the chance to shoot her, that he opted not to pursue her to avoid drawing attention to himself, and that he had anticipated fear would keep her from further extortion. Although Wall argues that "[McMahan was] not the 23-year-old naïve out-of-town dimwit the State portray[ed]," the jury was entitled to find otherwise, particularly as they heard her interview with Ranger Bradford and observed her during her own testimony.

Because there is ample evidence in the record to support his capital murder conviction and the jury's implicit rejection of his defenses, we overrule Wall's third and fourth issues. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Braughton*, 569 S.W.3d at 609.

### 2. Mistakes of fact

In his first two issues, Wall argues that a hypothetically correct jury charge should have included a mistake-of-fact instruction because the jury "could have been assisted by guidance regarding the significance of Wall's mistaken but reasonable

belief that the co-conspirators were armed" and that they planned to immediately kidnap K.W.

"[T]rial courts are not required to include an instruction on a defensive issue, like mistake of fact, unless the defendant requests it or objects to its omission." *Flores v. State*, 573 S.W.3d 864, 867 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *see Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). A defendant who fails to ask for an instruction on such issues, or to object to its exclusion, forfeits the alleged error on appeal. *See* Tex. R. App. P. 33.1; *Vega*, 394 S.W.3d at 519; *see also Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998).

The record here reflects that the trial court did not include a mistake-of-fact instruction in the jury charge and that there were no objections to the charge during the charge conference. Accordingly, Wall has not preserved his mistake-of-fact complaints for our review. *See* Tex. R. App. P. 33.1; *Flores*, 573 S.W.3d at 867–68 ("*If* the evidence raises a mistake-of-fact defense *and* the defendant requests an instruction, the trial court must instruct the jury on the defense." (emphases added)).

Further, Penal Code Section 8.02(a) states that it is a defense to prosecution that the defendant "through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code Ann. § 8.02(a). "Kind of culpability" refers to the mental state required for criminal responsibility. *Flores*, 573 S.W.3d at 868. As pointed out by the State, Wall's purported mistakes of fact—that Pohorence, McClellan, or both

possessed a firearm and that one or both planned to immediately kidnap K.W.—have no bearing on whether he intentionally or knowingly caused their deaths, which he admitted, because neither of these purported mistakes of fact would have negated his intent to kill them. *See Rodriguez v. State*, 538 S.W.3d 623, 627 (Tex. Crim. App. 2018) (stating that a mistake-of-fact instruction should only be given when the actor's mistake negates the culpable mental state required for the offense). A mistake about the existence of a fact that would establish an affirmative defense to an offense, rather than negating an element of the offense, does not raise a mistake-of-fact defense. *Johnson v. State*, Nos. 01-19-00776-CR, 01-19-00818-CR, 2022 WL 963277, at *14–15 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, pet. ref'd) (mem. op., not designated for publication) (explaining that an appellant's belief that the victims were threatening his life, whether mistaken or not, related to self-defense and not to the elements of the underlying offenses of murder and capital murder). We overrule Wall's first two issues.

### 3. Sudden passion

In his fifth issue, Wall argues that the evidence was insufficient to prove that he was guilty of capital murder because he acted with sudden passion under Penal Code Section 19.02(a)(2) and (d), making him guilty of second-degree murder.

The Court of Criminal Appeals has stated—in a habeas case—that a habeas applicant "could not have been entitled to a sudden-passion instruction at the punishment stage of trial because there was no punishment stage in his trial,

assessment of a life sentence being automatic when a defendant is found guilty of capital murder and the State does not seek the death penalty." *Ex parte Covarrubias*, 665 S.W.3d 605, 614 (Tex. Crim. App. 2023). That is, when a defendant is convicted of capital murder, a sudden-passion issue never comes into play. *Id.* (citing *Wesbrook v. State*, 29 S.W.3d 103, 112–13 (Tex. Crim. App. 2000),[34] and then *Mays v. State*, 318 S.W.3d 368, 387–88 (Tex. Crim. App. 2010)).[35]

As set out above, the record contains sufficient evidence to support Wall's capital-murder conviction. Assuming Wall preserved his sudden-passion complaint, we overrule his fifth issue because he was not entitled to a sudden-passion instruction after he was convicted of capital murder. *See id.*

### III. Conclusion

Having overruled Wall's five issues, we affirm the trial court's judgment.

---

[34]"The Legislature, through its broad power to classify crimes and those who stand accused of crimes, chose not to permit the defense of 'sudden passion' in the context of capital murder." *Wesbrook*, 29 S.W.3d at 113 (construing Penal Code Section 19.02(d)).

[35]"There is no free-floating, non-statutory, common-law right to an instruction on sudden passion and provocation in a capital-murder trial." *Mays*, 318 S.W.3d at 388 (citing *Wesbrook*, 29 S.W.3d at 112–13).

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 8, 2024